UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | |
|---|---|
| MORGAN-LARSON LLC, individually and on behalf of all others similarly situated, | |
| Plaintiff, | Case No. 4:14-cv-00635 |
| v. | **COMPLAINT— CLASS ACTION** |
| FERRELLGAS PARTNERS, L.P., a limited partnership; FERRELLGAS, L.P., a limited partnership, also doing business as BLUE RHINO; AMERIGAS PARTNERS, L.P., a limited partnership, also doing business as AMERIGAS CYLINDER EXCHANGE; and UGI CORPORATION, a corporation, | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

## CLASS ACTION COMPLAINT

1.     Plaintiff Morgan-Larson LLC, by and through its undersigned counsel, brings this action against Defendants based on their conspiracy to fix the prices of propane sold in exchangeable portable steel tanks (commonly referred to as "propane exchange tanks") in violation of the Sherman Act, 15 U.S.C. § 1 *et seq.*

2.     Plaintiff brings this action for itself and on behalf of all persons or entities (the "Class") who, during the period between July 21, 2008 and the present (the "Class Period") directly purchased propane in propane exchange tanks for resale from one or more Defendants.

3.     The allegations set forth herein are based on documents and information in Plaintiff's possession, and upon information and belief developed through investigation by Plaintiff and by counsel that included a review of publicly available documents, including a recent enforcement action brought against Defendants by the Federal Trade Commission ("FTC").

## PRELIMINARY STATEMENT

4.    Defendants, doing business as Blue Rhino and AmeriGas, are the two leading distributors of propane sold in propane exchange tanks and together control approximately 80 percent of the market for wholesale propane exchange tanks in the United States.

5.    Defendants sell propane stored in propane exchange tanks directly to retailers like Plaintiff and other members of the Class, who then re-sell the propane to their customers. Given their market dominance, Defendants' propane exchange tanks are available at tens of thousands of retail locations nationwide, including gas stations, convenience stores, grocery stores, and home improvement stores.

6.    After reaching record highs in 2003, consumer propane consumption fell by more than 10% through 2006. While the prices recovered briefly in 2007 and the first half of 2008, due to colder than usual temperatures, the price of propane began to plummet in the spring of 2008.



Fig.
A    **Historical Spot Prices**

2

7.     At the same time prices began falling, Defendant Blue Rhino attempted to increase its margins by reducing the amount of propane contained in its exchange tanks from 17 pounds to 15 pounds. Because Blue Rhino would reduce its fill level without reducing the wholesale prices of propane exchange tanks, such a reduction would increase the price per pound of propane purchased by Plaintiff and the Class by 13%, thereby offsetting some of the profits lost due to lower prices.

8.     Blue Rhino informed its competitor, AmeriGas, and certain retail customers that Blue Rhino was implementing the fill reduction. In response, AmeriGas also decided to implement the exact same fill reduction without a corresponding price decrease.

9.     However, when Defendants attempted to implement the fill reduction in the summer of 2008, two major customers that accounted for a significant percentage of Defendants' propane exchange tank business—Walmart and Lowe's—pushed back.

10.     Specifically, Lowe's conditioned its acceptance of the fill reduction on all of Blue Rhino's other customers, including Walmart, also agreeing to the fill reduction within a certain period of time. Lowe's included such a condition because it realized that consumers would not continue to purchase 15 pound propane exchange tanks from Lowe's if they could purchase 17 pound tanks for the same price from competitors.

11.     Walmart, which is a substantial customer of both Defendants, initially refused to accept the fill reduction. Because Walmart is such a large customer and purchases from both Defendants, neither Defendant could risk losing Walmart to the other by unilaterally proceeding with the price increase.

12.     Rather than allowing market forces to defeat their fill reduction initiative, Defendants colluded to force Walmart (and thus Lowe's and all other members of the Class) to

3

accept their illegal price increase. Through direct communications and in violation of the antitrust laws, Defendants agreed that neither would deviate from their fill reduction proposal in the face of Walmart's resistance and that both would push Walmart to promptly accept the effective price increase.

13.    In the face of this concerted pressure from its two suppliers of propane exchange tanks and without knowledge of the Defendants' illegal conspiracy, Walmart ultimately agreed to the fill reduction scheme.

14.    Defendants' conspiracy thus resulted in the illegal increase in the price per pound of propane sold not only to Walmart, but to Plaintiff and the entire Class. Absent Defendants' collusion, Walmart would not have acquiesced to Defendants' demands and Defendants would have been unable to implement their coordinated price increase.

15.    Plaintiff brings this action under the federal antitrust laws to recover the illegal overcharges that resulted from Defendants' anticompetitive conduct.

## THE PARTIES

16.    Plaintiff Morgan-Larson LLC is a limited liability company organized under the laws of the State of Mississippi that owned and operated convenience stores during the relevant time period doing business as Central Street Shell, Main Street Shell, West Jackson Shell and North Lamar Gas Mart. During the Class Period, Morgan-Larson LLC directly purchased propane in propane exchange tanks from one or both Defendants.

17.     Defendant Ferrellgas Partners, L.P., is a limited partnership organized, existing and doing business under and by virtue of the laws of the State of Delaware, with its principal place of business located at 7500 College Boulevard, Overland Park, Kansas. It maintains a

4

nearly complete interest in and conducts its business activities primarily through Defendant Ferrellgas, L.P.

18.     Defendant Ferrellgas, L.P., is a limited partnership organized, existing and doing business under and by virtue of the laws of the State of Delaware, with its principal place of business located at 7500 College Boulevard, Overland Park, Kansas. It resides in this district, with an office location at 12415 Renz Farm Road, Jefferson City, MO.

19.     Ferrellgas, L.P., doing business as Blue Rhino, operates a national propane distribution business, and owns or has access to distribution locations nationwide. Its business includes the filling, refilling, refurbishing, sale and distribution of propane exchange tanks under the Blue Rhino name. Blue Rhino's propane is sold to consumers at more than 43,000 retail locations nationwide through its exchange tank service.

20.     Defendant AmeriGas Partners, L.P., is a publicly traded master limited partnership, organized, existing, and doing business, under, and by virtue of, the laws of the State of Delaware, with its office and principal place of business located at 460 North Gulph Road, King of Prussia, Pennsylvania. AmeriGas Partners, L.P., operates a national propane distribution business through its subsidiary, AmeriGas Propane, L.P.

21.     Defendant AmeriGas Partners, L.P., through AmeriGas Propane, L.P., is engaged in the marketing and sale of propane and propane supply related services, including the distribution and supply of bulk propane to residential, commercial, and agricultural customers, and the preparing, filling, distributing, marketing, and sale of propane exchange tanks. AmeriGas Propane, L.P. often does business as AmeriGas Cylinder Exchange when preparing distributing, marketing, or selling propane in propane exchange tanks. AmeriGas resides in, and does

5

business in and around Jefferson City, with a location at 2727 W. Main Street, Jefferson City, MO.

22.     Defendant UGI Corporation is a corporation, organized, existing and doing business under and by virtue of the laws of the Commonwealth of Pennsylvania, with its office and principal place of business located at 460 North Gulph Road, King of Prussia, Pennsylvania. UGI Corporation is the parent and sole owner of AmeriGas Propane, Inc. AmeriGas Propane, Inc. is the general partner of Defendant AmeriGas Partners, L.P., and is a corporation organized, existing, and doing business under and by virtue of the laws of the Commonwealth of Pennsylvania, with its office and principal place of business located at 460 North Gulph Road, King of Prussia, Pennsylvania.

## JURISDICTION AND VENUE

23.     This Court has jurisdiction over the subject matter of this action pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, and 28 U.S.C. §§ 1331 and 1337.

24.     The claims asserted herein arise under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Act.

25.     Venue is proper within this District pursuant to Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 26, and 28 U.S.C. § 1391(b), (c), and (d).  With corporate offices both in and around Jefferson City, Defendants resided, transacted business, were found, or had agents in this District.   In addition, Defendants Amerigas has its registered agent in Jefferson City.  Moreover, because numerous class members located in this District purchased propane from Defendants at illegally inflated prices, a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.

6

## CLASS ACTION ALLEGATIONS

26.     Plaintiff brings this action as a class action under Rule 23(a) and 23(b)(3) of the

Federal Rules of Civil Procedure, on behalf of itself and all others similarly situated (the

"Class"):

> All persons and entities that, during the period between July 21, 2008 and the present (the "Class Period"), directly purchased propane in propane exchange tanks for resale from one or more Defendants.

27.     Excluded from the proposed Class are Defendants, any entity in which

Defendants have a controlling interest, Defendants' legal representatives, predecessors,

successors, assigns, and employees.

28.     The Class is so numerous that joinder of all members is impracticable.

29.     Plaintiff's claims are typical of the claims of the other members of the Class.

Plaintiff and the members of the Class sustained damages arising out of Defendants' common

course of conduct in violation of law as alleged herein. The injuries and damages of each

member of the Class were directly caused by Defendants' wrongful conduct.

30.     Plaintiff will fairly and adequately protect the interests of the members of the

Class and has retained counsel competent and experienced in class action and antitrust litigation.

31.     Common questions of law and fact exist as to all members of the Class, and

predominate over any questions affecting solely individual members of the Class. These

common questions include, but are not limited to: (i) whether Defendants conspired to

unreasonably restrain trade in violation of Section 1 of the Sherman Act by reducing the fill level

in propane exchange tanks from 17 pounds to 15 pounds without a corresponding price reduction

and by colluding not to deviate from this price increase with Walmart or other customers; (ii)

whether Defendants' conduct had an anticompetitive and manipulative effect during the Class

7

Period; (iii) whether Defendants' conduct resulted in inflated propane prices during the Class Period; (iv) the appropriate measure of damages for the injury sustained by Plaintiff and the other members of the Class; and (v) whether injunctive relief is appropriate.

32.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts and Defendants, and would create a risk of inconsistent adjudications of questions of law and fact common to the Class. A class action would achieve substantial economies of time, effort, and expense, and will ensure uniformity of decisions as to persons similarly situated. Plaintiff does not anticipate any difficulty in the management of this action as a class action.

## FACTUAL ALLEGATIONS

A.     **Background.**

33.     Propane, also known as liquefied petroleum gas ("LP-gas"), is a nontoxic, colorless gas that is used by millions of Americans for heating and cooking, among other uses.

34.     Propane exchange tanks are portable steel tanks that are prefilled with propane and are generally used for barbeque grills, patio heaters, and other outdoor applications such as fireplaces or mosquito traps.

35.     Propane exchange tanks sold in the United States are highly standardized products consisting of a tank and valve system. The propane sold in propane exchange tanks is also a homogenous product.

36.     Propane exchange tanks have a maximum capacity of 25 pounds, but safety regulations have limited the filling of such tanks to 20 pounds, or 80 percent of their capacity.

8

37.     In 2002, the National Fire Protection Association modified its standards to require that propane exchange tanks be equipped with an overfilling protection device ("OPD").

38.     After the creation of the OPD standard, Defendants adopted the practice of filling their propane exchange tanks with 17 or 17.5 pounds of propane.

39.     Propane exchange tanks are generally sold to end user consumers through retailers like Plaintiff and other members of the Class.  Retailers like Plaintiff generally offer consumers the option of purchased a prefilled tank in exchange for an empty tank or, for a higher price, a prefilled tank without returning an empty tank.

40.     Given the standardized and homogenous nature of propane exchange tanks, Defendants, their competitors and retailers treat them as functionally interchangeable and therefore customers can exchange any propane exchange tank at any retailer that carries propane exchange tanks without regard for the company that initially supplied the tank to be exchanged.

41.     To serve retail outlets that sell propane in propane exchange tanks, Defendants and their competitors need access to refurbishing and refilling facilities, where empty tanks can be cleaned, refurbished, repainted, and refilled.

42.     In or around 2006, Defendants entered into a series of "co-packing agreements" whereby each company agreed to refurbish and refill propane exchange tanks for the other company at certain of each company's facilities.  Each Defendant currently processes slightly less than ten percent of the other company's used, empty tanks pursuant to these agreements.

**B.     Defendants Conspired to Increase Propane Prices By Reducing the Fill Level of Propane Exchange Tanks.**

   **1.   Faced with Rising Input Costs, Defendants Desperately Wanted to Increase Prices But Competitive Forces Prevented Unilateral Action.**

9

43.     In early 2008, Defendants and other propane providers faced significant increases in propane exchange tank input costs such as propane, steel, and diesel fuel for delivery trucks.

44.     In an attempt to combat these rising input costs, in January 2008 Defendant AmeriGas contemplated whether to reduce the fill level in its propane exchange tanks. Based in part on concerns about losing business if competitors did not follow such a unilateral price increase, AmeriGas decided not to implement the fill reduction.

45.     Similarly, around the same time Defendant Blue Rhino also considered reducing the fill level in its propane exchange tanks. In April 2008, Blue Rhino management approved a proposal to reduce its fill level from the then-standard 17 pounds to 15 pounds without a corresponding price reduction (thus resulting in a 13% increase in the price of propane).

46.     The Blue Rhino proposal also included a provision to ask AmeriGas in advance whether their co-packing facilities could handle the proposed fill reduction.

47.     Blue Rhino understood that unilaterally reducing the fill level in its exchange tanks risked competitively disadvantaging the company if its principal competitor, AmeriGas, did not also reduce fill levels. Blue Rhino was particularly concerned about its competitive standing with its second largest customer, Walmart, because Walmart purchased propane in propane exchange tanks from both Blue Rhino and AmeriGas.

48.     Blue Rhino was also concerned about Walmart's reaction because Walmart is the largest propane exchange tank retailer in the United States. Blue Rhino services approximately 60 percent of the Walmart locations nationwide, while AmeriGas services approximately 35 percent. Ozark Mountain Propane Company ("Ozark"), a smaller regional propane supplier, services the remaining Walmart locations.

10

49.     The Blue Rhino Director of Strategic Accounts responsible for the Walmart account reported to his manager that the fill reduction could put Blue Rhino at a competitive disadvantage in relation to AmeriGas. He stated: "[I]n my mind the 'watch out' is the competitive difference between [Blue Rhino, AmeriGas] and Ozark. We are offering less product vs. [Walmart's] other 2 suppliers. . . . Once we explain this is a done deal (and that we are not asking for [Walmart's] input or letting him decide), he may become resentful and threaten to take states. . . . Then, we need to pray that [AmeriGas] takes a similar move as soon as possible. If [AmeriGas] doesn't move, we will have a BIG issue." He continued: "The only thing that can make this go away is if AmeriGas goes to 15 as well, but it has to happen very soon after us to legitimize our move."

50.     On or about April 22, 2008, Blue Rhino decided to inform Walmart of its fill reduction plan.

51.     On or about April 28, 2008, Blue Rhino's Director of Strategic Accounts met with the Walmart buyer and announced Blue Rhino's intention to reduce the fill in its propane exchange tanks. Walmart rejected the proposed fill reduction. Walmart's buyer told the Blue Rhino Director of Strategic Accounts that the fill reduction was a price increase that Walmart would not agree to. He also told Blue Rhino's Director of Strategic Accounts that Walmart did not want to carry propane exchange tanks with different fill levels—that is, tanks at 15 pounds in stores serviced by Blue Rhino and tanks at 17 pounds in stores serviced by AmeriGas and Ozark.

52.     On or about April 29, 2008, a senior Blue Rhino manager ordered production managers to "stand down" on implementation of the fill reduction because "[t]he call with Walmart did not go according to plan."

11

## 2. When Confronted With Competitive Resistance, Defendants Engaged in a Conspiracy to Implement their Price Increase.

53.     Blue Rhino followed its April 2008 communication plan, and informed AmeriGas "well in advance" that it planned to raise prices in June 2008 by reducing the fill level in its exchange tanks from 17 to 15 pounds without a corresponding price decrease.

54.     On May 29, 2008, Blue Rhino proposed the fill reduction to Lowe's, Blue Rhino's largest retail customer. Approximately two weeks later, Lowe's agreed to accept 15 pound exchange tanks on the condition that Blue Rhino convert all of its customers, including Walmart, to 15 pound tanks of propane within 30 days.

55.     On June 18, 2008, Blue Rhino's President telephoned AmeriGas's Director of National Accounts. The two men called each other six more times over the next 30 hours. The following day, Blue Rhino account executives again discussed the fill reduction with Walmart. Following the last of these calls, Blue Rhino's President reported, "I've continued to have a lot of inquiries from [AmeriGas] regarding the lower fuel fill due to their need to adjust production. I've been told that it would be very challenging to produce two different size products long-term. . . once again, messaging that they'll follow closely behind us in the market."

56.     On June 20, 2008, AmeriGas management produced a draft budget with a plan for reducing the fill level of AmeriGas's exchange tanks from 17 to 15 pounds.

57.     On or about June 25, 2008, Todd Brown, President of Blue Rhino and Senior Vice President of Sales and Marketing for Ferrellgas, Inc. called AmeriGas's president of sales and marketing to again discuss the fill reduction.

58.     Also on June 25, 2008, Blue Rhino began notifying its customers of its plans to reduce the fill level in its propane exchange tanks effective July 21, 2008.

12

59. As alleged above, AmeriGas had previously considered and rejected a plan to unilaterally reduce the fill level in its propane exchange tanks. AmeriGas believed it could be competitively disadvantaged if other companies in the industry did not also reduce the fill level in their propane exchange tanks.

60. After learning of Blue Rhino's plan to reduce the fill level of its exchange tanks, however, AmeriGas determined reconsidered its decision and decided to collude with Blue Rhino to reduce the fill level in its propane exchange tanks.

61. On or about June 26, 2008, Jay Werner of Blue Rhino and an AmeriGas employee discussed operational changes needed to implement the fill reduction. Representatives from the two companies also discussed the timing of the first distribution of under-filled propane exchange tanks to their customers.

62. By the last week of June 2008, Blue Rhino and AmeriGas formed an agreement on the fill reduction implementation plan. Blue Rhino would begin selling tanks with only 15 pounds of propane on July 21, 2008. AmeriGas would do the same on August 1, 2008.

63. AmeriGas described the change in the propane tank exchange program to its employees in a memorandum dated July 15, 2008: "In an attempt to offset some of these expenses, achieve desired product margins, and maintain retail prices at an attractive level for consumers, AmeriGas Cylinder Exchange and other national providers are transitioning to a 15 pound cylinder. This slight decrease from current 17 pound levels will quickly become the industry standard . . . ." (Emphasis added.)

64. In announcing the change to its production team, AmeriGas stated: "The cylinders will be filled with 3.5 gallons of propane versus the current 4 gallons. . . . The major competitors in cylinder exchange will also be moving to a 15 pound cylinder and as a result, it will become

13

the industry standard." (Emphasis added.) The "other national providers" and "major competitors" in the propane exchange industry referred to by AmeriGas include primarily, if not solely, Blue Rhino.

65. Blue Rhino remained concerned that if Walmart rejected the fill reduction, other major retailers would also reject the fill reduction on the grounds that they would be at a competitive disadvantage if the propane exchange tanks they sold contained less fuel than otherwise identical exchange tanks sold at Walmart.

66. In particular, as detailed above, Lowe's, Blue Rhino's largest customer, had agreed to accept the fill reduction only on the express condition that all Blue Rhino customers would also be forced to purchase 15-pound tanks within 30 days of Lowe's acceptance of the price increase.

67. Initially, Walmart resisted the new 15-pound tanks. From on or about July 10, 2008, and continuing for three months thereafter, Defendants colluded to force Walmart to accept the change. Sales executives from the two Defendants communicated repeatedly by telephone and email in order to coordinate their plan. They encouraged each other to stay loyal to their scheme and refuse to compete.

68. For example, on or about July 11, 2008, Blue Rhino's Vice President of Sales called AmeriGas's Director of National Accounts. The two sales executives spoke at length by telephone. Internal Blue Rhino documents confirm that AmeriGas and Blue Rhino sales executives discussed Walmart's rejection of AmeriGas's proposal to begin shipping 15-pound exchange tanks.

69. On or about July 21 and 22, 2008, Blue Rhino's Vice President of Sales and AmeriGas's Director of National Accounts spoke at length by telephone. Documents from Blue

14

Rhino confirm that the AmeriGas and Blue Rhino sales executives discussed AmeriGas's plans for responding to Walmart's refusal to accept the fill reduction.

70.     On or about August 11, 2008, AmeriGas' Director of National Accounts, who was responsible for dealing with Walmart, called Blue Rhino's Vice President of Sales and told him that he was having trouble getting in touch with Walmart to discuss the reduction in fill levels.

71.     On or about August 13, 2008, the Blue Rhino sales executives discussed plans to implore AmeriGas to ensure that Home Depot, AmeriGas's largest retail customer, also accepted the fill reduction. The executives reasoned that Walmart would be more likely to accept the fill reduction if it knew that Home Depot had already done so.

72.     On August 21, 2008, Blue Rhino and AmeriGas sales executives spoke several times by telephone. Shortly after these communications, an AmeriGas sales executive and AmeriGas's operations manager directed their colleagues to ensure that the Home Depot store in Rogers, Arkansas (near Walmart's Bentonville headquarters) carried only 15-pound tanks.

73.     On September 2, 2008, Blue Rhino's Vice President of Sales and AmeriGas's Director of National Accounts spoke by telephone. They discussed the status of their respective efforts to convert their customers to 15-pound tanks, as well as the current retail pricing of tanks at Lowe's.

74.     On September 12, 2008, Blue Rhino's Vice President of Sales and AmeriGas's Director of National Accounts again spoke by telephone. They discussed the status of their negotiations with Walmart. Expressing frustration at Walmart's intransigence, AmeriGas's Director of National Accounts suggested that it was time to issue an ultimatum to Walmart. Blue

15

Rhino's Vice President of Sales responded by telling him that Blue Rhino was continuing to work with Walmart and that AmeriGas should "hang in there."

75.     On September 15 and 22, 2008, Blue Rhino's Vice President of Sales and AmeriGas's Director of National Accounts again communicated by telephone.

76.     On September 30, 2008, AmeriGas's Director of National Accounts emailed Blue Rhino's Vice President of Sales and informed him that Walmart management was meeting the following day to discuss the proposed fill reduction.

77.     On October 6, 2008, the Lowe's buyer emailed his Blue Rhino sales executive with an ultimatum. As detailed above, Lowe's had agreed to accept 15-pound tanks on the condition that all other Blue Rhino customers would be converted within 30 days. Lowe's observed that Walmart was still selling 17-pound tanks and did not have to pay the price increase, thus harming Lowe's. The Lowe's buyer demanded that Blue Rhino fill Lowe's tanks with 17 pounds of propane so long as Blue Rhino did so for any of its other customers.

78.     The Lowe's demand confirmed to Blue Rhino that it needed Walmart to immediately accept the fill reduction or risk losing its ability to implement the price increase. It also highlighted the need for Blue Rhino and AmeriGas to continue to push Walmart to accept the fill reduction.

79.     On October 6, 2008, Blue Rhino's President forwarded the Lowe's email to his Vice President of Sales and directed him to finalize Walmart's acceptance of the fill reduction that day. Within a half hour, the Blue Rhino Vice President of Sales called his counterpart at AmeriGas. The two talked for 16 minutes.

16

80.     Following his 16-minute conversation with the AmeriGas Director of National Accounts, the Blue Rhino Vice President of Sales emailed Walmart to demand that it accept the fill reduction.

81.     Early the following morning, the AmeriGas Director of National Accounts emailed Walmart urging it to implement the fill reduction.

82.     On October 10, 2008, believing it had no alternative to accepting the fill reduction, Walmart acquiesced to the concerted demands of the conspirators and agreed to accept propane exchange tanks filled to 15 pounds from both Blue Rhino and AmeriGas.

83.     The secret agreement between Blue Rhino and AmeriGas that neither would deviate from their proposal to Walmart when faced with resistance from Walmart, and their combined efforts to push Walmart to promptly accept the fill reduction, had the effect of raising the price per pound of propane not only to Walmart, but to Plaintiff and the entire Class.

84.     Unlike large retailers such as Walmart, Lowe's and Home Depot, smaller retailers did not possess the power to resist Defendants' fill reduction plan and were forced to accept the reduction in exchange tanks from 17 to 15 pounds.

85.     The acts and practices of Defendants, as alleged herein, have the purpose, capacity, tendency, and effect of restricting or eliminating competition in the sale of propane in propane exchange tanks.

86.     Absent their unlawful agreement, Defendants would not have been able to reduce the fill levels of their tanks to 15 pounds.

87.     Defendants' conspiracy has continued until the present and remains ongoing. Both Defendants have continued to maintain the reduced fill levels despite the fact that propane prices have decreased substantially from their 2008 high.

17

**E. Regulatory Enforcement and Related Litigation.**

88. The United States Federal Trade Commission ("FTC") has initiated an administrative action to enjoin Defendants from engaging in their illegal conspiracy, which is set for a hearing in Washington, D.C. in December 2014.

89. In addition, Defendants have faced litigation from other injured parties. In June 2009, purchasers of propane exchange tanks brought numerous class action lawsuits against Defendants alleging that the conduct alleged herein violation state consumer protection and deceptive marketing statutes.

90. On such lawsuit was filed on June 4, 2009 as *Fuller v. AmeriGas Partners, L.P.*, No. 09-cv-2493 (N.D. Cal.) and sought to represent a class of "[a]ll purchasers of liquefied propane gas cylinders marketed or sold by AmeriGas and Blue Rhino nationwide from January 1, 2008 to the present." Compl., ECF No. 1-1, June 4, 2009, ¶ 41. Notably, the proposed class was not limited to indirect purchasers. Plaintiff and the other members of the Class alleged herein were thus absent class members in the *Fuller* case.

91. The Judicial Panel on Multidistrict Litigation ultimately transferred *Fuller* and all similar cases to this District for pretrial coordination and consolidation as *In re Pre-Filled Propane Tank Marketing and Sales Practices Litigation*, MDL No. 2086.

92. On December 9, 2009, the consolidated plaintiffs filed a motion for certification of a settlement class and preliminary approval of a proposed settlement with AmeriGas. The settlement class was defined to include "[a]ll people in the United States who purchased or exchanged an AmeriGas 20-pound propane gas cylinder, *not for resale*, between August 1, 2008 and November 30, 2009." *In re Pre-Filled Propane Tank Mktg. & Sales Prac. Litig.*, No. 09-cv-465 (W.D. Mo.) ("In re Pre-Filled Propane Tank"), ECF No. 37, Dec. 8, 2009 (emphasis added).

18

Because Plaintiff and the Class alleged in this case purchased propane exchange tanks directly from Defendants for resale, they were *not* members of this settlement class.

93.     On February 22, 2010, counsel for the consolidated class actions filed a consolidated class action complaint, seeking to represent a class of "All persons who purchased a Propane Tank sold, marketed, or distributed by any Defendant during the applicable limitations periods" bringing claims under, *inter alia*, 15 U.S.C. § 1. *In re Pre-Filled Propane*, ECF No. 79, Feb. 22, 2010. The proposed class was not limited to indirect purchasers. Accordingly, Plaintiff and other members of the Class alleged herein were thus absent class members in this case. While the complaint only named Blue Rhino as a Defendant, it specifically reserved to the right to amend the Complaint to include AmeriGas in the event that the settlement with AmeriGas did not become final.

94.     On October 6, 2010, the court granted final approval to the AmeriGas class action settlement. Although there were various changes made to the settlement, the class definition ultimately excluded direct purchasers like Plaintiff and the alleged Class who purchased propane exchange tanks for resale.

95.     On October 6, 2011, the consolidated plaintiffs filed a motion for certification of a settlement class and preliminary approval of a proposed settlement with Blue Rhino. The settlement class was defined to include "[a]ll people in the United States who purchased or exchanged one or more of Ferrellgas's 20-pound propane gas cylinders, *not for resale*, between June 15, 2005, and the date of Preliminary Approval." *In re Pre-Filled Propane Tank*, No. 09-cv-465 (W.D. Mo.), ECF No. 249, Oct. 6, 2011 (emphasis added). Because Plaintiff and the Class alleged in this case purchased propane exchange tanks directly from Defendants for resale, they were not members of this settlement class.

19

96.     On May 31, 2012, the court granted final approval to the Blue Rhino class settlement.

97.     Despite their settlements, Defendants have not resumed competition and reversed their illegally agreed-upon fill levels. Accordingly, Defendants continue to maintain the unlawfully inflated prices that resulted from their scheme.

## STATUTE OF LIMITATIONS

98.     As described above, previous litigation known as *In re Pre-Filled Propane Tank*, was brought against Defendants on August 6, 2009. At that time and continuing until at least December 9, 2009 (the date on which class plaintiffs disclosed they were seeking to certify a settlement class as to AmeriGas that excluded direct purchasers), Plaintiff and the alleged Class in this case were part of these prior alleged classes.

99.     Even after disclosing the AmeriGas settlement, the plaintiffs in the prior litigation filed a consolidated complaint against Blue Rhino that continued to seek to represent a nationwide class of all purchasers of propane exchange tanks, including direct purchasers such as Plaintiff and the Class in this case.

100.     Accordingly, as to Defendant Blue Rhino, Plaintiff and the Class alleged herein remained part of the putative *In re Pre-Filled Propane Tank* class until at least October 6, 2011, when the class plaintiffs in that case first disclosed that they were seeking to certify a settlement class as to Blue Rhino that excluded direct purchasers of propane exchange tanks for resale.

101.     As a result of these previous cases and the class action tolling rule set forth in *American Pipe Construction Co. v. Utah*, 414 U.S. 538 (1974), Plaintiff and the Class's claims were tolled against AmeriGas from at least August 6, 2009 to at least December 9, 2009, and against Blue Rhino from at least August 6, 2009 to October 6, 2011.

20

102.    The recent FTC action filed on March 27, 2014 also extends the tolling period because it is a civil proceeding "instituted by the United States to prevent, restrain, or punish violations of . . . the antitrust laws," and therefore suspends the statute of limitations for Plaintiffs' action from March 27, 2014 until one year after the resolution of that action. 15 U.S.C. § 16(i).

103.    The continuing violation doctrine also tolls the statute of limitations. Defendants previously settled with indirect purchasers or end users of propane exchange tanks. However, despite these settlements, Defendants have not resumed competition and reversed their illegally agreed-upon fill levels.

104.    Accordingly, Defendants' sales pursuant to the conspiracy continue to the present day and constitute a continuing violation that allows Plaintiff and the Class to recover for damages they suffered at any point during the conspiracy.

## DEFENDANTS' ANTITRUST VIOLATIONS

105.    During the Class Period, Defendants engaged in a continuing agreement, understanding, or conspiracy in restraint of trade to artificially reduce the tan size for propane exchange tanks from the industry-standard 17 pounds to 15 pounds, and thus inflate the price of propane paid for by Plaintiffs and the Class by 13%.

106.    In formulating and effectuating the contract, combination, or conspiracy, Defendants engaged in anticompetitive activities, the purpose and effect of which were to fix, maintain, suppress, and otherwise make artificial the price of propane sold in propane exchange tanks.

21

## PLAINTIFF AND THE CLASS SUFFERED ANTITRUST INJURY AS A RESULT OF DEFENDANTS' CONDUCT

107.    Defendants' anticompetitive conduct had severe adverse consequences on competition in that Plaintiff and other members of the Class who would have paid less for propane paid 13% more as a result of Defendants' tank-size reduction scheme.

## FIRST CLAIM FOR RELIEF

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT (15 U.S.C. § 1) AND SECTION 4 OF THE CLAYTON ACT (15 U.S.C. § 15)

108.    Plaintiff incorporates by reference the preceding allegations.

109.    Defendants and their unnamed co-conspirators entered into and engaged in a conspiracy in restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15.

110.    During the Class Period, Defendants engaged in an illegal conspiracy to force Walmart, and thus Plaintiff and other members of the Class to accept their tank-size reduction scheme and thereby inflate the price of propane purchased by Plaintiff and the Class.

111.    The conspiracy consisted of a continuing agreement, understanding, or concerted action between and among Defendants, in furtherance of which Defendants fixed the price of propane in propane exchange tanks.  Defendants' conspiracy is a *per se* violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade and commerce.

112.    Defendants' conspiracy, and the resulting impact on the market for propane sold in propane exchange tanks, occurred in or affected interstate and foreign commerce.

113.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Class have suffered injury to their businesses or property.

22

## RELIEF SOUGHT

114. Plaintiff demands the following relief:

(a) That the Court determine that this action may be maintained as a class action under Rule 23(b)(3) of the Federal Rules of Civil Procedure; that Plaintiff be appointed as class representative; and that Plaintiff's counsel be appointed as counsel for the Class;

(b) That the unlawful conduct alleged herein be adjudged and decreed to be an unlawful restraint of trade in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act;

(c) That Defendants, their subsidiaries, affiliates, successors, transferees, assignees, and their respective officers, directors, partners, agents, and employees, and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from continuing and maintaining the conspiracy alleged in this Complaint;

(d) That Plaintiff and the Class recover damages as provided under federal antitrust laws and the state antitrust laws set forth above, and that a joint and several judgment in favor of Plaintiff and the Class be entered against Defendants in an amount to be trebled or otherwise enhanced in accordance with such laws;

(f) That Plaintiff and the Class recover their costs of this suit, including attorneys' fees, as provided by law; and

(g) That the Court direct such further relief it may deem just and proper.

## DEMAND FOR JURY TRIAL

115. Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial as to all issues triable by a jury.

Dated: July 17, 2014

By: ___ /s/ J. Michael Ponder
J. Michael Ponder, Mo Bar #38066
COOK BARKETT PONDER & WOLZ
1610 N. Kings Highway, Suite 201
Cape Girardeau, MO 63701
Telephone: (573) 335-6651
Facsimile: (573) 335-6182
mponder@cbpw-law.com

Vineet Bhatia
Richard W. Hess
Alexander L. Kaplan
SUSMAN GODFREY LLP
1000 Louisiana, Suite 5100
Houston, TX 77002-5096
Telephone: (713) 651-9366
Facsimile: (713) 654-6666
vbhatia@susmangodfrey.com
rhess@susmangodfrey.com
akaplan@susmangodfrey.com

Stephen Morrissey
SUSMAN GODFREY LLP
1201 Third Avenue, Suite 3800
Seattle, WA 98101-3000
Telephone: (206) 516-3880
Facsimile: (206)516-3883
smorrissey@susmangodfrey.com

R. Bryant McCulley
MCCULLEY MCCLUER PLLC
2113 Middle Street, Suite 208
Sullivan's Island, SC 29482
Telephone: (205) 238-6757
Facsimile: (662) 368-1506
bmcculley@mcculleymccluer.com

Stuart H. McCluer
MCCULLEY MCCLUER PLLC
1223 Jackson Avenue East, Suite 200
Oxford, Mississippi 38655
Telephone: (662) 550-4511
Facsimile: (662) 368-1506
smccluer@mcculleymccluer.com

*Counsel for Plaintiff Morgan-Larson LLC and the Proposed Class*

Case 4:14-cv-00635-DGK   Document 1   Filed 07/18/14   Page 24 of 24